**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LORI BURT,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social<br>Security,<br><br>　　　　　　Defendant. | ) Case No. EDCV 17-0714-JPR<br>)<br>)<br>) **MEMORANDUM DECISION AND ORDER**<br>) **AFFIRMING COMMISSIONER**<br>)<br>)<br>)<br>)<br>)<br>) |

**I.　PROCEEDINGS**

　　Plaintiff seeks review of the Commissioner's final decision denying her applications for Social Security disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c). The matter is before the Court on the parties' Joint Stipulation, filed December 5, 2017, which the Court has taken under submission without oral argument. For the reasons stated below, the Commissioner's decision is affirmed.

**II.  BACKGROUND**

Plaintiff was born in 1960.  (Administrative Record ("AR") 44, 54, 199.)  She completed high school (AR 204) and worked as a sales manager in a consignment store and an in-home caretaker (AR 27-30, 37, 204, 228, 248).

On November 20, 2013, Plaintiff applied for DIB and SSI, alleging that she had been unable to work since October 15, 2013, because of fibromyalgia, nerve damage, sciatica, "spinal issues," degenerative joint disease, vascular veins, shoulder pain, lower-back and leg pain and swelling, and "[f]oot problems."  (AR 44-45, 54-55, 159-61, 165-74, 203.)  After her applications were denied initially and on reconsideration (<u>see</u> AR 64-65, 74-81), she requested a hearing before an Administrative Law Judge (AR 82-83).  A hearing was held on August 7, 2015, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert.  (<u>See</u> AR 23-43, 157.)  In a written decision issued September 1, 2015, the ALJ found Plaintiff not disabled. (AR 10-22.)  Plaintiff sought Appeals Council review (AR 5), which was denied on March 6, 2017 (AR 1-4).  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. <u>See</u> <u>id.</u>; <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Parra v. Astrue</u>, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept

as adequate to support a conclusion. <u>Richardson</u>, 402 U.S. at 401; <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. <u>Lingenfelter</u>, 504 F.3d at 1035 (citing <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. <u>Id.</u> at 720-21.

**IV. THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

A. <u>The Five-Step Evaluation Process</u>

The ALJ follows a five-step evaluation process to assess whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i),

3

416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, the claimant is not disabled and her claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform her past work; if so, she is not disabled and the claim must be denied. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id. If that happens or if the claimant has no past relevant work, the

---

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations. §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); Drouin, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 15, 2013, the alleged onset date. (AR 12.) At step two, he concluded that Plaintiff had severe impairments of "lumbar degenerative disc disease, spondylosis and varicose veins." (AR 12-13.) At step three, he determined that Plaintiff's impairments did not meet or equal a listing. (AR 13.) At step four, the ALJ found that Plaintiff had the RFC to perform a limited range of light work:

> [She] can lift and/or carry no more than 20 pounds occasionally and 10 pounds frequently and sit, stand and/or walk no more than six hours out of eight[,] [but] [p]ushing and/or pulling with either the upper or lower extremities is unlimited other than for the weight limitations described[;] [s]he can no more than occasionally climb ramps or stairs but never ladders, ropes or scaffolds[;] and she can no more than occasionally bend, stoop or kneel but is precluded from work requiring crawling.

(AR 13-17.) Based on the VE's testimony, the ALJ concluded that Plaintiff could perform her past relevant work as an

5

"owner/manager of a thrift store." (AR 17.) Thus, he found

Plaintiff not disabled. (AR 17-18.)

**V. DISCUSSION**

Plaintiff argues that the ALJ improperly rejected the

opinion of internist David L. Blinn, a treating physician. (J.

Stip. at 3-7.) As discussed below, the ALJ properly evaluated

the medical-opinion evidence. Accordingly, remand is not

warranted.

A. <u>Applicable Law</u>

Three types of physicians may offer opinions in Social

Security cases: those who directly treated the plaintiff, those

who examined but did not treat the plaintiff, and those who did

neither. <u>Lester</u>, 81 F.3d at 830. A treating physician's opinion

is generally entitled to more weight than an examining

physician's, and an examining physician's opinion is generally

entitled to more weight than a nonexamining physician's. <u>Id.</u>;

<u>see</u> §§ 404.1527, 416.927.[2] But "the findings of a nontreating,

nonexamining physician can amount to substantial evidence, so

_____

[2] Social Security regulations regarding the evaluation of
opinion evidence were amended effective March 27, 2017. When, as
here, the ALJ's decision is the final decision of the
Commissioner, the reviewing court generally applies the law in
effect at the time of the ALJ's decision. <u>See</u> <u>Lowry v. Astrue</u>,
474 F. App'x 801, 804 n.2 (2d Cir. 2012) (applying version of
regulation in effect at time of ALJ's decision despite subsequent
amendment); <u>Garrett ex rel. Moore v. Barnhart</u>, 366 F.3d 643, 647
(8th Cir. 2004) ("We apply the rules that were in effect at the
time the Commissioner's decision became final."); <u>Spencer v.
Colvin</u>, No. 3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D.
Wash. Dec. 1, 2016) ("42 U.S.C. § 405 does not contain any
express authorization from Congress allowing the Commissioner to
engage in retroactive rulemaking"). Accordingly, citations to 20
C.F.R. §§ 404.1527 and 416.927 are to the versions in effect from
August 24, 2012, to March 26, 2017.

long as other evidence in the record supports those findings." Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam) (as amended).

The ALJ may disregard a physician's opinion regardless of whether it is contradicted. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989); see Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008). When a physician's opinion is not contradicted by other medical-opinion evidence, however, it may be rejected only for "clear and convincing" reasons. Magallanes, 881 F.2d at 751; Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it. Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). The weight given a treating or examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6). Those factors also determine the weight afforded the opinions of nonexamining physicians. §§ 404.1527(e), 416.927(e). The ALJ considers findings by state-agency medical consultants and experts as opinion evidence. Id.

Furthermore, "[t]he ALJ need not accept the opinion of any physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004). An ALJ need not recite "magic words" to reject a physician's opinion or a portion of it; the court may draw "specific and

7

legitimate inferences" from the ALJ's opinion. <u>Magallanes</u>, 881 F.2d at 755. The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "'evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." <u>Ryan v. Comm'r of Soc. Sec.</u>, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

B. <u>Relevant Background</u>

1. <u>Medical records</u>

Plaintiff alleges that the onset date of her disability was October 15, 2013. (<u>See</u> AR 45, 55.) In October 2013, she sought treatment at Little River Medical Clinic. (AR 342-45, 350-51.) She had a history of hypertension, hypothyroidism, osteoarthritis, degenerative disc disease of the lumbar spine, bilateral vein-stripping surgeries, and epidural injections. (AR 342, 350.) She was "[a]lert"; "[o]riented to time, place, and person"; "[w]ell developed"; and "[i]n no acute distress." (AR 344, 350-51.) Her "[n]eck demonstrated no decrease in suppleness." (AR 344.) Though she experienced "[n]o tenderness on palpation" to her back, "[l]umbosacral spine pain was elicited by motion, especially with flexion," and "[b]ack extension [was] markedly restricted and painful." (AR 344, 351.) She had "normal shoulder range of motion to forward flexion and abduction." (AR 351.) Her "[b]iceps, triceps, and hand intrinsic strengths [were] 5/5," and her "[q]uadriceps, plantar, and dorsiflexors strengths [were] 5/5." (<u>Id.</u>) Sensation "in all four extremities and all dermatomes" was "intact to light touch." (<u>Id.</u>) She was assessed with "[b]enign essential hypertension," hypothyroidism, "[l]umbar degenerative dis[c] disease with

chronic back pain," "[p]robable fibromyalgia syndrome," and
"[l]ong-term opioid use." (AR 344, 351.) She reported that she
"hope[d] to find a job as a Home Care Aid." (AR 343.)[3]

On February 5, 2014, Plaintiff saw interventional pain
specialist and anesthesiologist Kevin Hibbard at Advanced Pain
Medicine. (AR 361-63.) She "exibit[ed]" "no overt pain
behavior" and was "able to comfortably endure the history and
physical examination." (AR 362.) Dr. Hibbard observed that she
was "well-developed," "well-nourished," and "in no acute
distress." (Id.) Her extremities showed "[n]o cyanosis,
clubbing, [or] edema" and "exhibit[ed] normal tone and muscle
bulk." (Id.) Her "[m]uscle strength [was] 5 out of 5 proximally
and distally in all 4 extremities except +4/5 [in her] left
quadricep flexion." (Id.) Her "[m]uscle stretch reflexes were
preserved in all 4 extremities symmetrically," but she had
"[d]ecreased sensation to light touch diffusely in [her] left
lower leg." (Id.) Plaintiff's "[s]traight leg raise [was]
positive on the left and negative on the right." (Id.) Her
lumbar flexion was "[m]oderate[ly] decreased" "due to pain," and
though her lumbar extension was "[i]ntact," she "report[ed] pain"
in that area. (Id.) Dr. Hibbard noted "[t]ender[ness] to
palpation through [Plaintiff's] entire thoracic midline and

_____

[3] Plaintiff had been performing that service for pay for six
years for her ex-husband before stopping in October 2013. (AR
27-29, 37.) Although she told the ALJ she stopped because she
"[c]ould no longer do it" (AR 28), that same month she told a
nurse practitioner that she hoped to find an in-home care
position (AR 343). In December 2013, she reported that she lived
with her "ex-husband 'friend'" (AR 212), and that same month her
father stated that she was still taking care of him (AR 221). In
February 2014, she wrote in a function report that she took care
of him "when [she] c[ould]." (AR 237.)

paraspinal muscles[,] lumbar midline[,] and right lumbar paraspinal muscles." (Id.) He assessed her with "[l]umbar and thoracic spinal pain secondary to discogenic syndrome versus facet arthropathy," "[l]eft lower extremity radicular syndrome," "[p]ossible lateral carpal tunnel syndrome," and "[m]ultiple muscle pain with possible fibromyalgia." (Id.)

Plaintiff first saw Dr. Blinn on February 18, 2014. (AR 356-58.) Her "appetite [was] good" and "weight [was] stable." (AR 356.) She also was "tolerating [her] medications well." (Id.) Dr. Blinn observed that she was "oriented to person, place, [and] time"; "well developed and well-nourished"; and in "[n]o acute distress." (AR 357.) Her extremities had "[f]ull range of motion" without any clubbing, cyanosis, or edema. (Id.) Her spine was "nontender" with "normal contour and mobility." (Id.) Her "[c]ranial nerves 2-12 [were] intact," her "motor and sensory exams [were] normal," and she had "no [neurologic] localizing deficits." (Id.) Dr. Blinn diagnosed Plaintiff with fibromyalgia, hypothyroidism, hypertension, osteoporosis, arthritis, chronic venous insufficiency, and vitamin D deficiency and told her to return in "about 2 months." (AR 357-58.)

On February 28, 2014, Plaintiff reported to Dr. Hibbard that she "continue[d] to have ongoing lumbar spinal pain, mid spinal pain, and left posterior thigh and lateral thigh pain." (AR 535.) Her "[p]ain [was] made worse with activity including standing[,] bending[,] twisting[,] and extension of the lumbar spine." (Id.) Dr. Hibbard observed "[t]enderness to palpation in [her] lumbar spine" and "5/5 strength" in her "bilateral hip flexion, knee extension, knee flexion, knee abduction, . . . EHL

extension, and toe flexion." (Id.) She was "[a]ble to transition from a seated to standing position without any hesitation, pushoff, or use of [her] upper extremities," and she was "[a]ble to stand and ambulate without assistance." (Id.) Her cranial nerves were "grossly intact," but she showed "[p]ositive paresthesias in the left lower extremity." (Id.)

In March 2014, Plaintiff filled out an "Employability Assessment Form," stating that she "ache[d] all the time" because of "joint disease, upper compression fractures in [her] back, peripheral vascular disease, [a] torn sciatic nerve, . . . nerve damage all down [her] left side, [and] fibromyalgia." (AR 513-14.) Dr. Blinn checked a box on that form indicating that she was "permanently disabled" and diagnosed her with peripheral neuropathy, a chronic sciatic nerve injury, and chronic fibromyalgia. (AR 513.) That same month, Dr. Hibbard noted that Plaintiff had "[m]ildly decreased strength with left lower extremity knee extension and knee flexion." (AR 531.) Plaintiff had "[t]enderness to palpation of [her] lumbar spine" and "[s]ignificant pain with extension over the lumbar spine at the waist." (Id.) Another interventional pain specialist and anesthesiologist at Advanced Pain Medicine, Matthew JP LoDico, noted that Plaintiff had "[n]o clubbing, cyanosis or edema" in her extremities, and she possessed "5/5 strength in [her] right lower extremity" and "4-5 strength in [her] left lower extremity." (AR 529-30.) She was "exquisitely tender to palpation in the lumbosacral region over spinous process at L4 and 5 and [in the] left SI joint." (AR 529.) She had a "[p]ositive straight leg raise on the left," "[p]ositive Faber

test[4] on the left," and "[p]ositive pain with internal rotation of [her] femur at [the] hip on the left." (Id.)

On April 2, 2014, an EMG was conducted. (See AR 520-25.) The results were "within normal limits," with "no clear conclusive electrophysiologic evidence of peripheral neuropathy and/or lumbar radiculopathy." (AR 520.) Plaintiff apparently received an epidural injection on April 10, 2014, administered by Dr. Hibbard (AR 528), and on April 22, 2014, Dr. Blinn's notes show a primary diagnosis of "[w]eight gain" (AR 517). In May 2014, a bilateral ultrasound of the veins in Plaintiff's right and left lower extremities was conducted. (AR 526.) It demonstrated "good venous flow with no intraluminal thrombus." (Id.) The "veins were compressible throughout," and there was "normal respiratory variation and augmentation of flow." (Id.) Overall, there was "[n]o sonographic evidence of [deep vein thrombosis] in the regions examined." (Id.) A physician's assistant, with Dr. Blinn "[c]ollaborating," diagnosed her with "[c]hronic venous insufficiency" and "[v]aricose veins of both legs with edema," however (AR 518-19), and referred her to vascular surgery (AR 518).

On May 20, 2014, Dr. Blinn completed a medical-source statement regarding Plaintiff's Social Security claim. (AR 365-68.) He wrote that Plaintiff's symptoms were "[d]iffuse pain throughout [her] body, headaches, paresthesias, memory difficulties, [and] sleep disturbance." (AR 365.) He stated

---

[4] A Faber test identifies pain in the hip, lumbar spine, and sacroiliac region. See FABER Test, Physiopedia, https://www.physio-pedia.com/FABER_Test (last visited May 8, 2018).

that "[d]ue to [these symptoms], [Plaintiff was] totally [and] perman[en]tly disabled." (Id.)  He noted that Plaintiff was suffering from fibromyalgia, a "chronic pain syndrome" that caused her "[s]evere" pain.  (AR 368; see also AR 365.)  Her pain caused "[l]oss of interest in almost all activities," "[a]ppetite disturbance with change in weight," "[s]leep disturbance," "[c]rying spells," and "[d]ecreased energy."  (AR 368.)  He noted "present" next to limitations associated with her pain as follows: "[m]arked restriction of activities of daily living"; "[m]arked difficulty in maintaining social functioning"; and "[d]eficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere)."  (Id.)

Dr. Blinn also assessed "[o]ccasional" physical restrictions for "2-3 [c]umulative [h]ours" during an "8 [h]our [w]orkday" and "[f]requent" restrictions for "3-5" cumulative hours.  (AR 366.) He checked boxes indicating that Plaintiff could "[o]ccasional[ly]" lift and carry zero to 20 pounds and "[n]ever" carry "25 pounds" "or [m]ore."  (Id.)  She could stand and walk "[l]ess [t]han 2 [h]ours" and needed to "periodically alternate sitting and standing at [an] interval not to exceed . . . 30 min[utes]."  (Id.)  She experienced "fatigue," "require[d] rest periods during the day," and needed to "[f]requently" "[e]levate [her] legs" and "[l]ie down during an 8 hour work day."  (Id.) Pushing and pulling was "[l]imited" in her upper and lower extremities "due to pain [and] weakness."  (AR 367.)  She could "[o]ccasionally" climb and balance but "[n]ever" stoop, kneel, crouch, or crawl.  (Id.)  Dr. Blinn opined that Plaintiff was

13

"[u]nlimited" in reaching, handling, and dexterity, and she should "avoid exposure to" moving machinery, vibration, and noise. (Id.)

On June 27, 2014, an MRI of Plaintiff's lumbar spine revealed a "[m]ild old compression fracture at L1," "[g]rade 1 anterior spondylolisthesis of L4 on L5 and L5 on S1," and "[d]egenerative changes with mild spinal stenosis and mild recess narrowing at L4-L5." (AR 527.) The next available records, from November 26, 2014, show that Plaintiff sought treatment at the Arrowhead Regional Medical Center, complaining of "facet [joint] pain" and "pain [in the] flexion/extension [of her] back." (AR 418-19.) She was assessed with hypothyroidism, hypertension, lumbar degenerative disc disease, facet joint dysfunction, radiculopathy, and morbid obesity (AR 418) and referred to a pain-management clinic (AR 511; see also AR 418-19).

On April 3, 2015, Plaintiff complained to a pain-management specialist of "constant," "sharp, dull, throbbing, burning and aching" pain that was "increased by bending and standing" but "decreased by medication and epidurals." (AR 1118.) She had "no cyanosis, no clubbing and no edema" in her extremities. (AR 1119.) She had "decreased [range of motion on] all plane[s]" in her back, left lumbar radicular pain, and pain with facet-loading maneuvers. (Id.) She was advised to "stretch and exercise." (Id.) On April 28, 2015, Plaintiff reported that her "right knee pain [was] quite bothersome," though her medications still "help[ed]." (AR 1121.)

In May 2015 at a pain-management appointment, Plaintiff still complained of low-back, hip, and knee pain that was

14

"decreased by medication and rest and shots." (AR 1104.) The physician's assistant observed that she had "normal strength" in her upper and lower extremities, "normal" walking gait, and an "equal and strong" grip. (Id.) There was "no cyanosis," "clubbing," or "edema" in her lower extremities. (Id.) "All [range of motion was] within normal limits." (Id.) She was assessed with spinal stenosis, herniated nucleus pulposus, thoracic and lumbar neuritis radiculitis, and lumbosacral spondylosis. (Id.) In June 2015, Plaintiff was "doing much better" after receiving an epidural, which was "quite effective." (AR 1099.) She reported being "quite pleased with [her] outcome" from pain management. (Id.) Her extremities showed "no edema." (AR 1100.) She had "start[ed] to lose weight" and was "quite motivated to . . . start walking once her knee [felt] better." (Id.)

2. Function reports

On December 12, 2013, Plaintiff filled out a function report. (AR 212-19). She wrote that she "d[id]n't sleep normal hours" and that it took her "about 2 hours" to get dressed in the morning. (AR 212.) She "walk[ed] [her] dog 2 or 3 times a day to the mailbox [and] back for exercise," "play[ed] with [her] animals," and did "a little housekeeping," which consisted of "light dusting," doing "some dishes," and "rak[ing] the leaves around [her] trailer." (AR 212, 214-16.) "[O]nce or twice a week [she also did] laundry at [the] laundr[o]mat" with her stepmother. (AR 213.) She stated that she "love[d] people [and] visit[ed] with neighbors daily." (Id.) She took care of and fed her pets with some help from her father and stepmother. (Id.)

15

She also apparently went to garage sales once a week. (AR 216.)
Her impairments affected her personal care in that it took her
longer to dress, and she showered and shaved less frequently than
she used to. (Id.) She "prepare[d] [her] own meals" of soup,
sandwiches, and "T.V. dinners," but she cooked less than she used
to because she "c[ouldn't] stand [for] long." (AR 214.) She
shopped "at least once a week for [her] animals or groceries."
(AR 216. But see AR 215 (stating that she shopped "in stores"
"once a month").) She stated that she could "only walk [a
quarter] mile" before needing to "rest or sit or elevate" her
legs for "5 . . . to 10" minutes before resuming walking. (AR
217.)

On December 14, 2013, Plaintiff's father filled out a third-
party function report. (AR 220-27.) He stated that Plaintiff
took care of her ex-husband by cooking for him and doing his
laundry. (AR 221.) She also fed her pets, walked her dog, and
cleaned the cat litter. (Id.) He wrote that "to the best of
[his] knowledge[,] [Plaintiff] d[id] not have any personal
hygiene problems," and she "tells us she prepares complete meals"
"daily." (AR 221-22.) Plaintiff's stepmother took her to local
food banks, the grocery store, and the laundromat "about once a
week," where Plaintiff was able to "put her clothes in [and] take
them out of the machine." (AR 222-23.) She "visit[ed] with
people in the R.V. Park," including when they "stop[ped] by her
trailer." (AR 224, 227.) He stated that "it appear[ed] to be
painful for [Plaintiff] to lift anything heavy," including a bag
of groceries, and that "it hurt[] when she squat[ted] or ben[t]
over or kne[lt] down." (AR 225.) She could walk "about 1/4 mile

to a small local store" and presumably back again. (Id.) She "limp[ed] when she walk[ed]." (AR 227.)

On February 20, 2014, Plaintiff filled out a second function report and a supplemental function questionnaire. (AR 236-46.) She wrote that she "c[ouldn't] stand [or] sit[] in any position [for] very long because of nerve damage, numbness [and] vein circulation problems." (AR 236.) "[O]n some days [she couldn't] function due to [her] fibromyalgia" unless she had "bed rest [and] heat." (Id.) She stated that she took care of her ex-husband "when I can," cooked for him, and "help[ed] him walk [the] dog." (AR 237.) She prepared her own meals "once or twice a day." (AR 238.) She shopped "once a week" for about half an hour. (AR 239.) She "ache[d] all the time," and her "leg burn[ed] like [it was] on fire since [her] last surgery." (AR 240.) She had "sharp[,] stabbing pain[] in [her] back [and] down [her] leg," and "[a]ny lifting made it worse." (AR 245; see also AR 246.) She could lift only "10" pounds, her legs "[would] go numb," she had "shoulder problem[s] with reaching," it "burn[ed] when [she] walk[e]d," and her "knees hurt bad[ly] when [she went] up steps." (AR 241.) She also "c[ouldn't] concentrate" and had problems with "memory [and] understanding." (Id.) She could walk half a block before her legs burned and ached, and she needed to rest for "5 minutes or longer" before continuing on. (Id.)

3. <u>Plaintiff's testimony</u>

At her August 7, 2015 hearing, Plaintiff testified that she could "hardly walk on [her] right knee."[5] (AR 31.) She stated that her fibromyalgia caused pain "[a]ll over" and that "[a]t least once a week" she "c[ouldn't] . . . get out of bed" because of the pain. (AR 33-34.) She couldn't "sit" or "lie too long" or her legs would become "numb." (AR 34.) She was able to take care of, wash, and dress herself but "not as often as [she] used to." (AR 35-36.) She testified that she couldn't "walk a block . . . without stopping." (AR 36.) She could lift and carry "maybe 10 pounds." (<u>Id.</u>)

C. <u>Analysis</u>

The ALJ gave "no weight" to Dr. Blinn's May 20, 2014 opinion. (AR 16.) Plaintiff argues that the ALJ improperly rejected it.[6] (J. Stip. at 3-7.) The ALJ discounted Dr. Blinn's

_____

[5] At the hearing, Plaintiff's counsel acknowledged that no "diagnostic studies" demonstrated any problems with Plaintiff's knee and said they were "still waiting" for them. (AR 32.)

[6] Plaintiff also contends that the ALJ "failed to address and evaluate [a] medical opinion dated March 6, 2014." (J. Stip. at 3, 7 (citing AR 513-14).) That one-page check-box form, also completed by Dr. Blinn, contained no "judgments about the nature and severity of [Plaintiff's] impairments," statements about her "physical or mental restrictions," or descriptions of what she could "still do despite [her] impairment(s)." §§ 404.1527(a)(2), 416.927(a)(2). Thus, it likely did not constitute opinion evidence that the ALJ needed to weigh. <u>See</u> <u>Howard ex rel. Wolff v. Barnhart</u>, 341 F.3d 1006, 1012 (9th Cir. 2003) (ALJ not required to discuss evidence that is "neither significant nor probative"). As noted by Defendant, however (J. Stip. at 11-12), even if the form was opinion evidence, its significance would have been minimal for one of the same reasons the ALJ gave for rejecting Dr. Blinn's May 20, 2014 opinion: it was a "pre-printed form" "appear[ing] through a series of checked boxes" without "specific clinical or objective support" (AR 16). Thus, any error by the ALJ in failing to address it in his decision was

opinion because "it appear[ed] on a pre-printed form" "of checked boxes" "solicited by [Plaintiff's] representative," "without much in the way of specific clinical or objective support"; the "extreme functional limitations" assessed conflicted with the record and with "Dr. Blinn's own objective findings"; and Plaintiff's "own self report of her activities of daily living [was] seemingly greater than [the] assessed limitations." (AR 16.) Because Dr. Blinn's opinion was contradicted by a state-agency medical consultant's opinion (see generally AR 44-63), the ALJ was required to provide a "specific and legitimate" reason for rejecting it. See Carmickle, 533 F.3d at 1164. He did so.

### 1.   Preprinted form

"An examining doctor's findings are entitled to no less weight when the examination is procured by the claimant than when it is obtained by the Commissioner." Lester, 81 F.3d at 832. In the absence of evidence of impropriety, "[t]he purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them." Id.; Reddick, 157 F.3d at 726. Thus, to the extent the ALJ rejected Dr. Blinn's opinion because it was "solicited by [Plaintiff's] representative" (AR 16), he likely erred. See Reddick, 157 F.3d at 726; Hurter v. Berryhill, 712 F. App'x 691, 692 (9th Cir. 2018). Though the ALJ may have erred in this regard, any error was harmless because he identified and explained other specific and legitimate reasons for rejecting Dr. Blinn's opinion, as discussed below. See DeBerry v. Comm'r of

---

harmless. See Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) ("[W]e may not reverse an ALJ's decision on account of an error that is harmless.").

Soc. Sec. Admin., 352 F. App'x 173, 176 (9th Cir. 2009); Bartels v. Colvin, No. CV 15-5144 AFM, 2016 WL 768851, at *4 (C.D. Cal. Jan. 29, 2016).

The ALJ was entitled to discount Dr. Blinn's opinion based on the little explanation he gave for his findings. The opinion Dr. Blinn provided was on a preprinted "check-box"-type form. (See AR 365-68.) He wrote that her symptoms were "[d]iffuse pain throughout [her] body, headaches, paresthesias, memory difficulties, [and] sleep disturbance." (AR 365.) He diagnosed her with "[c]hronic pain syndrome" and "[f]ibromyalgia" (AR 365, 368) and stated that she was treated through "[p]ain management [and] possibly [a] rheumatology referral" (AR 365). He then opined that Plaintiff was "totally [and] perman[en]tly disabled." (Id.) Plaintiff argues that the "handwritten portions" of this "detailed form" "clarified the basis for [Dr. Blinn's] opinion." (J. Stip. at 4-5.) But though he filled in a few blanks, Dr. Blinn did not provide any explanation for how he determined that Plaintiff was "totally" disabled or what objective tests he did to support such restrictive findings. (AR 365); De Guzman v. Astrue, 343 F. App'x 201, 208-09 (9th Cir. 2009) (ALJ was "free to reject" doctor's check-off report that did not "indicate any measuring of effort or give[] a description" of how patient was evaluated (alteration in original)). Moreover, the form in seven places invited him to add "[s]upportive medical findings" for his assessment, but he completed only one of those blanks — by writing that the pushing and pulling limitations he assessed were "due to pain [and] weakness" — and left the rest empty. (See AR 366-67.)

Thus, the ALJ's finding that Dr. Blinn's opinion "appear[ed] on a pre-printed form" "without much in the way of specific clinical or objective support" was a sufficient reason to discount its weight. (AR 16); see Thomas, 278 F.3d at 957 (ALJ may discredit opinion that is "inadequately supported by clinical findings"); Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ permissibly rejected psychological evaluations "because they were check-off reports that did not contain any explanation of the bases of their conclusions"); see also Batson, 359 F.3d at 1195 ("[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings[.]").

## 2. Medical evidence of record

Plaintiff contends that the ALJ erred in holding "that [Dr. Blinn's] opinion [was] inconsistent with the medical record as a whole [and with] Dr. Blinn's own clinical findings." (J. Stip. at 5-6.) On the contrary, the ALJ did not err in this regard.

Inconsistency with the objective medical evidence can be a specific and legitimate reason for rejecting a medical-source opinion. See Batson, 359 F.3d at 1195 (lack of "supportive objective evidence" and "contradict[ion] by other statements and assessments of [plaintiff's] medical condition" were "specific and legitimate reasons" to discount physicians's opinions); Kohansby v. Berryhill, 697 F. App'x 516, 517 (9th Cir. 2017) (upholding inconsistency with medical-opinion evidence as specific and legitimate reason for rejecting medical opinion (citing Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008))); Bailey v. Colvin, 659 F. App'x 413, 415 (9th Cir. 2016)

(inconsistency with "own treatment records" and objective medical evidence constitutes "specific and legitimate" reason for rejecting treating physician's opinion). Dr. Blinn checked boxes indicating that Plaintiff could stand and walk for less than two hours, could lift and carry up to 20 pounds occasionally but never more, needed to alternate sitting and standing at 30-minute intervals, and was limited in pushing and pulling in all extremities. (AR 366-67.) He also opined that Plaintiff was "totally" disabled. (AR 365.) As noted by the ALJ, however, "[t]here [was] no demonstrated medical pathology . . . in [the] record [that] would account for such extreme functional limitations," and "[e]ven Dr. Blinn's own objective findings" were mostly "normal." (AR 16.)

First, that Dr. Blinn's treatment notes failed to support his opinion that Plaintiff was "totally [and] perman[en]tly disabled" (AR 365) was a legitimate reason to discount his opinion. Bailey, 659 F. App'x at 415. He saw Plaintiff on only three occasions before completing his May 20, 2014 opinion. (See AR 356-58, 517, 519.) His physical examination of Plaintiff revealed "[f]ull range of motion" and "no" clubbing, cyanosis, or edema in her extremities (AR 357), conflicting with his finding that she was "[l]imited" in both upper and lower extremities for pushing and pulling (AR 367). Though he opined that Plaintiff exhibited "[d]iffuse tenderness" (AR 365), the only mention of tenderness in his treatment notes was to record its absence (AR 357 (spine "nontender," "no rebound tenderness" in abdomen, and "nontender" bowel sounds)). His notes also state that she had "normal contour and mobility" in her spine, "normal" motor and

sensory exams, "no localizing deficits," and "intact" cranial
nerves. (Id.) Thus, that Dr. Blinn's opinion was unsupported by
his own treatment records was a specific and legitimate basis for
the ALJ to discount it. See Thomas, 278 F.3d at 957; Houghton v.
Comm'r Soc. Sec. Admin., 493 F. App'x 843, 845 (9th Cir. 2012);
Phelps v. Berryhill, 714 F. App'x 628, 630 (9th Cir. 2017)
(affirming ALJ's discounting of physicians' opinions because
"they were not consistent with their own objective findings").
Moreover, opinions such as Dr. Blinn's that Plaintiff was
"totally . . . disabled" (AR 365) are reserved to the
Commissioner and "can never be entitled to controlling weight or
given special significance." SSR 96-5p, 1996 WL 374183, at *5
(July 2, 1996); see §§ 404.1527(d)(1), 416.927(d)(1) ("A
statement by a medical source that you are 'disabled' or 'unable
to work' does not mean that we will determine that you are
disabled.").

    Second, the ALJ found that the "extreme functional
limitations" assessed by Dr. Blinn were unsupported by any
"demonstrated medical pathology" in the record. (AR 16.) This
was a proper reason to discount his opinion. Williams v.
Berryhill, 710 F. App'x 320, 321 (9th Cir. 2018) (affirming ALJ's
discounting of treating physician's opinion because "medical
record as a whole was inconsistent with the degree of
limitations" assessed and physician's "opinion was inadequately
supported by clinical findings"). Indeed, Plaintiff's imaging
during the relevant time period had "normal" or "mild" results:
an April 2, 2014 EMG "was essentially within normal limits" (AR
520-25); a May 6, 2014 bilateral ultrasound of her veins found

"[n]o sonographic evidence of [deep vein thrombosis]" (AR 526); and a June 27, 2014 MRI of her lumbar spine showed a "[m]ild old compression fracture," "[g]rade 1 anterior spondylolisthesis," and "[d]egenerative changes with mild spinal stenosis and mild recess narrowing" (AR 527). Moreover, she often showed "normal" or "full" range of motion (AR 351 (Oct. 2013), 357 (Feb. 2014), 1104 (May 2015). But see AR 1119 (Apr. 2015: "decreased" range of motion)); "5/5," "4/5," or "normal" strength (AR 351 (Oct. 2013), 362 (Feb. 2014), 529 (Mar. 2014), 535 (Feb. 2014), 1104 (May 2015)); and "[n]o" cyanosis, clubbing, or edema (AR 357 (Feb. 2014), 362 (same), 1100 (June 2015), 1104 (May 2015), 1119 (Apr. 2015)). She also at times had "normal tone and muscle bulk" in her extremities (AR 362 (Feb. 2014)) and "normal walking gait, station and posture" (AR 1104 (May 2015)).

As pointed out by Plaintiff, however, she had "at least three" positive straight-leg-raise tests on the left side (J. Stip. at 5 (citing AR 362, 529, 1119)) and one observation of "18/18 myofascial tender points as described by the American College of Rheumatology" (id. (citing AR 351)) and "was found to have tenderness to palpation" in her back (id. (citing AR 529, 1119); see also AR 362, 531. But see AR 344 (Oct. 2013: "[n]o tenderness on palpation" in back)). She also regularly complained of pain. (See, e.g., AR 33 (fibromyalgia caused pain "[a]ll over"), 245 ("sharp," "stabbing pain" in back and down leg), 344 ("[l]umbosacral spine pain"), 351 ("[b]ack extension" "painful"), 362 (lumbar pain), 535 ("ongoing lumbar spinal pain, mid spinal pain, and left posterior thigh and lateral thigh pain"), 1118 ("sharp, dull, throbbing, burning and aching"

pain).)  But the ALJ found Plaintiff's subjective symptom
statements "not entirely credible" (AR 17), which she has not
challenged on appeal.  Also, treatment seemed to decrease her
pain.  (See, e.g., AR 1099 (epidural was "quite effective" and
she was "quite pleased" with pain-management treatment), 1104
(pain "decreased by medication and rest and shots"), 1118 (pain
"decreased by medication and epidurals"), 1121 (medications
"help[ed]" her knee pain).)  Thus, despite the positive findings
pointed out by Plaintiff, the ALJ's conclusion that the objective
medical record did not support Dr. Blinn's opinion that she was
"totally" disabled was rational and supported by substantial
evidence.  See Ryan, 528 F.3d at 1198 ("'Where evidence is
susceptible to more than one rational interpretation,' the ALJ's
decision should be upheld." (citation omitted)).

Accordingly, that Dr. Blinn's opinion was inconsistent with
the objective medical evidence and his own treatment notes was a
specific and legitimate reason for rejecting it.  See Batson, 359
F.3d at 1195; Kohansby, 697 F. App'x at 517; Bailey, 659 F. App'x
at 415.

### 3.  Activities of daily living

Plaintiff argues that the "fact that [she] retains the
ability to engage in some limited [activities of daily living] in
no way diminishes the persuasiveness of Dr. Blinn's opinion
regarding her work-related functional limitations."  (J. Stip. at
6.)  As the ALJ noted, however, Plaintiff's "own self report of
her activities of daily living [was] seemingly greater than Dr.
Blinn's assessed limitations."  (AR 16.)

Plaintiff walked her dog multiple times a day (AR 213, 215,

221), shopped for groceries with her father and stepmother "at least once a week" (AR 216, 223), and prepared her own meals daily (AR 214, 222). She was able to walk a quarter-mile to a store and back and rake leaves. (AR 215, 225.) She went to the laundromat "once or twice a week" to do her laundry and was able to put her clothes in the machine and take them out herself. (AR 213-14, 222.) She did light dusting at home. (AR 214.) Despite her testimony at the hearing that she stopped caring for her ex-husband in October 2013, she later admitted that she continued to care and cook for him to some degree, which her father confirmed. (AR 221, 237.) Similarly, although she told the ALJ that she stopped taking care of her husband in October 2013 because she no longer could do so, that same month she reported to a nurse practitioner that she "hope[d] to find a job as a Home Care Aid," indicating that she believed herself capable of work activity. (AR 343.) Another treating doctor advised her to "stretch and exercise" as treatment. (AR 1119.) She "visit[ed] with people in the R.V. Park" "daily," including when they "stop[ped] by her trailer." (AR 213, 224, 227.) These activities contradict Dr. Blinn's finding that Plaintiff had "[m]arked" restrictions in activities of daily living as well as "[m]arked" difficulty in maintaining social functioning. (AR 368.) See Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (holding that inconsistency with Plaintiff's "level of activity" was "adequate reason[]" to discount physician's opinion); Lunn v. Astrue, 300 F. App'x 524, 525 (9th Cir. 2008) (affirming ALJ's rejection of treating physician's medical opinion that was "contrary to [plaintiff's] reports of her daily activities").

Accordingly, the ALJ did not err in assessing the medical-opinion evidence. Substantial evidence supports the ALJ's decision. As such, remand is not warranted. <u>See</u> <u>Stubbs-Danielson v. Astrue</u>, 539 F.3d 1169, 1174 (9th Cir. 2008).

## VI. CONCLUSION

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[7] IT IS ORDERED that judgment be entered AFFIRMING the Commissioner's decision, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.

DATED: May 9, 2018

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[7] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."